UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PATRICK HENNESSEY,

      Plaintiff,

                                 Case No. 1:21-cv-301

v.

                                 Hon. Hala Y. Jarbou

MID-MICHIGAN EAR, NOSE AND
THROAT P.C.,

      Defendant.

_____/

## OPINION

Plaintiff Dr. Patrick Hennessey brings this action against Defendant Mid-Michigan Ear, Nose and Throat P.C. ("MMENT"). Hennessey alleges that MMENT breached an employment agreement and shareholder agreement between the two parties. He further alleges that it retaliated against him in violation of the False Claims Act ("FCA"). Before the Court is MMENT's motion for partial summary judgment (ECF No. 114) on a "notice-pled" disability retaliation claim as well as MMENT's motion for partial summary judgment (ECF No. 123) on the FCA retaliation claim. For the reasons stated below, the Court will deny both motions, the latter without prejudice.

### I. FACTUAL BACKGROUND

MMENT is a physician-owned private practice of otolaryngologists and audiologists in the Lansing, Michigan area. From May 2013 until January 2021, Hennessey practiced as an otolaryngologist at MMENT pursuant to a written employment agreement ("the Employment Agreement"). (Emp. Agreement, ECF No. 114-10, PageID.2049.) The Employment Agreement includes, among other things, addendums outlining Hennessey's compensation schedule, severance benefits, and a definition of total disability. (*See id.*, PageID.2059-2063.) Hennessey

became a fully vested shareholder in the practice in accordance with Section 20 of the Employment Agreement as well as a stock purchase agreement.  (*Id.*, PageID.2097, 2113-2115.)[1]

### A. Hennessey's History at MMENT

According to MMENT, Hennessey has a history of being unaccommodating and treating other medical practitioners inappropriately.   MMENT has documented a series of incidents including, but not limited to, the following:  in November 2014, a physician at Sparrow Hospital stated that Hennessey was "not cooperative" and declined to operate on a patient despite being the "physician covering ENT" at the time.  (11/25/2014 Email from Sparrow Re: Hennessey, ECF No. 114-1, PageID.2003.)

In November 2019, while Hennessey was the on-call provider for McLaren Hospital, he received a phone call regarding a hearing aide dome that could not be removed by the emergency department staff.   Hennessey believed that the patient's situation was not an emergency. Hennessey emailed the Chief Medical Officer at McLaren stating that he is "at the end of [his] rope" and "want[s] these calls to stop."  (11/27/2019 Email from Hennessey to McLaren, ECF No.114-4, PageID.2017.)  He further stated that he would "no longer accept calls from residents or midlevel providers."  (*Id.*)

In May 2020, the Medical Director of McLaren's Emergency Department emailed Dr. Ahmed Sufyan, another MMENT physician, outlining her concerns with Hennessey and his dealings with the McLaren emergency department.   She wrote that when Hennessey is on-call, "most of our providers are *altering treatment plans or trying to arrange care elsewhere* so they can avoid calling Dr. Hennessey on the phone" because "[h]e is condescending and insulting to our ED team with each and every call."  (5/27/2020 Email from McLaren Re: Hennessey, ECF

---

[1] The Stock Purchase Agreement is attached to the Employment Agreement located at ECF No. 114-10.

No. 114-5, PageID.2024 (emphasis in original).)  She also revisited the November 2019 incident regarding the patient with a hearing aide dome and noted that Hennessey told the patient that the emergency department inappropriately treated the condition and caused damage to the ear.  This "provided inappropriate ammunition for litigation" and resulted in the patient "expecting financial compensation."  (*Id.*)

**B. Hennessey's Previous Concerns About In-Office Balloon Sinuplasty Procedures**

Physicians at MMENT perform a procedure in the office called a balloon sinuplasty. According to the American Academy of Otolaryngology - Head and Neck Surgery ("AAO-HNS"), a balloon sinuplasty procedure is an appropriate "first line" surgical alternative for patients with sinusitis, particularly Chronic Rhinosinusitis ("CRS") and Recurrent Acute Rhinosinusitis ("RAR").  (Casiano Rep., ECF No. 131-4, PageID.2735-2736; *see also* Shermetaro Rep., ECF No. 132-1, PageID.2950; Shermetaro Dep. 62, ECF No. 131-5.)

For such procedures, "[t]here is a higher reimbursement rate in-office versus . . . doing balloons in the operating room."  (Shermetaro Dep. 56-57; *see also* Casiano Rep., PageID.2737.) Because these procedures may be separately billed to Medicare for reimbursement, there is "some concern within the industry over [its] potential inappropriate use."  (Shermetaro Dep. 67.)  But the procedure is still widely used across the nation.  For example, one of Hennessey's experts testified that the five ENTs in his office each perform two or three balloon sinuplasty procedures per week, so approximately 100 to 150 per year.  (Casiano Dep. 24-25, ECF No. 123-20.)[2]

In November 2017, Hennessey grew concerned with the use of the balloon sinuplasty procedure at MMENT.  Hennessey avers that a MMENT medical assistant sparked his concern by asking him why he was not performing a balloon sinuplasty on a patient without CRS or RARS,

---

[2] Excerpts of Dr. Roy Casiano's deposition can also be found at ECF Nos. 123-25, 131-6, and 132-2.

since the assistant had recently observed another MMENT physician performing the procedure on a patient with a similar CT scan.  (Hennessey Decl. ¶¶ 13-14, ECF No. 131-10.)

Hennessey acted on his concern by looking into the patient files of other MMENT physicians to determine whether the balloon sinuplasties performed were medically necessary.  In an email to Dr. Mark Lebeda, a fellow physician and the President of MMENT, Hennessey called his actions "a mistake" and clarified that he was "not saying anyone [was] doing anything unethical" but thought "that MMENT's recent history should lead [them] to be hypervigilant to prevent even the appearance of impropriety."  (11/16/2017 Email Exchange Between Hennessey & Lebeda, ECF No. 123-4, PageID.2464.)  Hennessey also testified that Lebeda "put[] [him] on the spot unexpectedly" at the next shareholder meeting by calling attention to his actions.  (Hennessey Dep. 151.)   In an email to Hennessey after the meeting, Lebeda noted that approximately three to five in-office balloon sinuplasty procedures had been done at that point and that "performing these procedures from this time forward [would] be heavily scrutinized."  (11/16/2017 Email Exchange Between Hennessey & Lebeda, PageID.2465.)

Hennessey's concerns over the in-office balloon sinuplasty procedure resurfaced in 2020.  Hennessey alleges that, in July 2020, MMENT's office manager Pam Trgina told him that Sufyan was performing the procedure without a properly documented justification.  (Hennessey Dep. 154, ECF No. 131-9.)[3]  Trgina testified that the conversation concerned the documentation procedures of all MMENT physicians, not just Sufyan.  (Trgina Dep. 83-84, ECF No. 131-11.)[4]  Hennessey then asked Trgina if he could propose a bi-annual audit process of each physician's patient charts at the next shareholder meeting.  (Trgina Dep. 80-81; Hennessey Dep. 197.)  But Trgina testified

---

[3] Excerpts of Hennessey's deposition can also be found at ECF Nos. 114-25, 118-4, 123-7, 123-12, 123-17, 123-18, 123-22, 123-24, 123-25, 131-9, and 133-1.

[4] An excerpt of Trgina's deposition can also be found at ECF No. 132-6.

that Hennessey's proposal related to cerumen removal, not in-office balloon sinuplasty procedures. (Trgina Dep. 82.)  At the shareholder meeting on August 18, 2020, Hennessey began to discuss MMENT's exposure to penalties from Medicare and private payers if MMENT sought payment for in-office balloon sinuplasty procedures that lacked the proper documentation, but Lebeda cut him off.  (Hennessey Dep. 198-99; Hennessey Decl. ¶¶ 32-33.)

MMENT also acquired a TruDi surgical navigation system from Acclarent, Inc. in 2020. According to Hennessey, the TruDi system makes balloon sinuplasty procedures easier and faster to perform.  (Hennessey Decl. ¶ 39.)  Pursuant to a written agreement with Acclarent, MMENT would pay for the TruDi system by purchasing at least six sinuplasty balloons per month from Acclarent.  (Acclarent Contract, ECF No. 131-12, PageID.2805.)  Hennessey was concerned that this arrangement would improperly incentivize MMENT to perform unnecessary balloon sinuplasty procedures.  (*See* Hennessey Decl. ¶ 42.)

### C. Hennessey's Injury

In November 2020, Hennessey suffered a shoulder injury while caring for his two-year-old son.  (Hennessey Dep. 259.)  Hennessey informed MMENT of his injury on November 9, 2020. (11/9/2020 Hennessey Email, ECF No. 114-6.)  Some MMENT physicians responded by offering to cover his on-call shifts.  (11/9/2020 Resp. Emails, ECF No. 114-7.)

In the coming months, Hennessey provided updates to the MMENT physicians on his injury.  On November 24, 2020, Hennessey told them that he would offer telehealth visits to those patients already scheduled with him and continue to check his messages in Allscripts.  (11/24/2020 Hennessey Email, ECF No. 114-8.)  On December 18, 2020, Hennessey informed the MMENT physicians that he would have shoulder surgery on January 4, 2021, and that it could be up to six months before he returned to work.  (12/18/2020 Hennessey Email, ECF No. 114-9.)

Hennessey also proposed that he limit his obligations to MMENT during his recovery.  In 2017, Hennessey argued that another MMENT physician, Dr. Danielle Gainor, should still be responsible for paying her overhead while on maternity leave.  (10/16/2017 Hennessey Email, ECF No. 114-11; Gainor Dep., ECF No. 114-22, PageID.2202-2203.)  Despite this, in a December 22, 2020, email, Hennessey indicated that he did not want to pay overhead costs during his recovery.  (12/22/2020 Hennessey Email, ECF No. 114-13.)  He also noted that he believed his injury qualified as a disability under the employment contract, but that he was not requesting disability payments.  (*Id.*)

With respect to call coverage, Hennessey indicated that Dr. Brian Peshek, another MMENT physician who does not take calls pursuant to his employment contract, "should finally start participating equally in the call pool" because his "chronic underbilling has weakened [MMENT's] negotiating position with Sparrow [Hospital] to get higher compensation for [] call coverage."  (12/27/2020 Hennessey Email, ECF No. 114-14, PageID.2129-2130.)

Finally, Hennessey contacted Trgina about suspending his medical malpractice insurance for the duration of his recovery.  Trgina advised Hennessey that, if he suspended his policy, he would not be charged for the insurance but could not see or talk to any patients during that time.  (12/18/2020 Hennessey & Trgina Email Exchange, ECF No. 131-32.)

### D. Hennessey's Termination

After Hennessey's surgery on January 4, 2021, MMENT sought legal advice from an employment law attorney about potential grounds to terminate Hennessey under the Employment Agreement.  (Goebel Dep., ECF No. 114-23, PageID.2227-2231.)[5]  MMENT then approached Hennessey with a final proposal to resolve their issues at a shareholder meeting on January 19,

---

[5] Excerpts of Goebel's deposition can also be found at ECF Nos. 131-15 and 132-4.

2021.  MMENT proposed that Hennessey be responsible for paying overhead costs during recovery, that the partners cover his calls, that he make up the missed calls within two years of his return, that he receive his portion of the COVID payment protection plan money granted to MMENT once he had made up his calls, and that he return to work within 180 days as required by the Employment Agreement.   (Goebel Dep., PageID.2233-2234; Hennessey Dep. 303.) Hennessey was not terminated at the meeting.  (Hennessey Dep. 303; Sufyan Dep. 266, ECF No. 131-25.)[6]

Approximately one hour after the meeting, Hennessey remotely accessed the patient charts of other MMENT physicians to "gather the evidence of what [he] believed to be fraudulent balloon sinuplasty procedures."  (Hennessey Dep. 209.)  He took screenshots of the charts.  (*Id.*; *see also* Screenshots of Patient Charts, ECF No. 123-13.)  Hennessey also testified that, before the meeting, the partners were discussing "how they were excited to have a new balloon machine in the practice, how they had been using it and how they were excited it was going to allow them to do more balloon sinuplasty procedures."  (Hennessey Dep. 208.)  So, Hennessey alleges that the procedure was at "the forefront of [his] mind" before the meeting even started.  (*Id.* at 208-09.)

Lebeda, on the other hand, testified that Hennessey was visibly upset after hearing MMENT's final proposal at the meeting.  (Lebeda Dep., ECF No. 114-21, PageID.2190-2191.)[7] This, coupled with Hennessey's history of previously accessing the patient charts of other MMENT physicians, led Lebeda to suspect that Hennessey would again access patient charts "to find leverage."  (*Id.*, PageID.2191.)  He asked Trgina to look into the matter and discovered that Hennessey had accessed approximately twelve to thirteen charts of individuals that were not his

---

[6] Excerpts of Sufyan's deposition can also be found at ECF Nos. 114-20 and 132-5.

[7] Excerpts of Lebeda's deposition can also be found at ECF Nos. 123-16, 131-18 and 132-3.

patients. (*Id.*, PageID.2193-2194.) Lebeda reviewed the charts Hennessey had accessed and called a shareholder meeting for January 22, 2021. (*Id.*, PageID.2197.) At the same time, Lebeda was also informed that Hennessey had suspended his liability insurance. (*Id.*, PageID.2196.)

In a letter dated January 22, 2021, and signed by Lebeda, MMENT terminated Hennessey pursuant to Section 2(g) of the Employment Agreement. MMENT listed two reasons for Hennessey's termination: (1) Hennessey's unauthorized access of patient charts, which MMENT called "a potential violation of HIPPA" that "substantially jeopardize[d] the reputation and regular functions of MMENT," and (2) Hennessey's unilateral decision to suspend his medical malpractice insurance while MMENT physicians "were under the impression that, although unable to see patients in person or practice surgery, [Hennessey] would be available for consultations, telehealth and other professional services, on an as needed basis." (Termination Letter, ECF No. 114-17, PageID.2153.)

MMENT further contends that, although not listed in his termination letter, Hennessey's refusal to pay overhead and retain on-call obligations as well as his history of being unaccommodating and treating other medical practitioners inappropriately also factored into the termination decision. (*See* Goebel Dep. 28, 44-45; Lebeda Dep. 100.)

## II. LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A material fact is genuinely disputed when there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249 (citing *First Nat'l Bank of Ariz. v. City Serv. Co.*, 391 U.S. 253, 288-89 (1961)). Summary judgment is not an opportunity for the Court to resolve factual disputes. *Id.* The Court "must shy

away from weighing the evidence and instead view all the facts in the light most favorable to the

nonmoving party and draw all justifiable inferences in their favor."  *Wyatt v. Nissan N. Am., Inc.*,

999 F.3d 400, 410 (6th Cir. 2021).

### III. ANALYSIS

**A. Disability Rights Retaliation**

**1. Notice Pleading**

According to MMENT, Hennessey's complaint "alleges three delineated Counts, and one

notice-pled claim . . . . The notice-pled claim sounds in alleged disability rights retaliation[,]" 42

U.S.C. § 12203.  (Def.'s Br. in Supp. of Mot. for Summ. J. on Notice-Pled Claim, ECF No. 114,

PageID.1995.)  MMENT points to portions of Hennessey's complaint as evidence of this "notice-

pled" claim.  (*See* Compl. ¶¶ 64, 66, 68, 92, ECF No. 1.)

MMENT filed a motion for partial summary judgment on this disability retaliation claim

that Hennessey did not explicitly plead in his complaint, but that MMENT nonetheless believes

Hennessey may raise at trial.  However, in response to MMENT's motion for partial summary

judgment, Hennessey clearly states that he is *not* pursuing a retaliation claim.  (Pl.'s Br. in Opp'n

to Def.'s Mot. for Summ. J. on Notice-Pled Claim, ECF No. 118, PageID.2271, 2274-2275 ("Dr.

Hennessey would have gladly clarified that he did not bring a disability retaliation claim under 42

U.S.C. § 12203 . . . . Dr. Hennessey's Complaint does not assert a disability retaliation claim under

42 U.S.C. § 12203 or any other statute.").)  Accordingly, the Court declines to address the merits

of a claim that Hennessey neither alleges in his complaint nor seeks to pursue now at the summary

judgment stage.  The Court will deny MMENT's motion for partial summary judgment on the

"notice-pled" disability retaliation claim as moot.

### 2. Fees and Costs

Both MMENT and Hennessey request fees and costs incurred in bringing and opposing this motion, respectively.  They each believe that the other acted in bad faith.  According to Hennessey, MMENT filed the present motion without seeking his concurrence in good faith.  (*See* Pl.'s Br. in Opp'n to Def.'s Mot. for Summ. J. on Notice-Pled Claim, PageID.2277-2279.) MMENT, on the other hand, believes Hennessey "fail[ed] to act in good faith when the early, easy, and timely resolution of this matter was in his control at all times[.]"  (Def.'s Reply Br. in Supp. of Mot. for Summ. J. on Notice-Pled Claim, ECF No. 119, PageID.2346.)

With respect to all motions, the Court's local rules require that "the moving party [] ascertain whether the motion will be opposed."  W.D. Mich. L.Civ.R. 7.1(d).  "Concurrence-type rules such as Rule 7.1(d) serve to preclude the incurrence of unnecessary fees, costs and expenses by the party who intends to file the motion where the non-moving party concurs with the relief sought by the party intending to file the motion."  *Wohadlo v. Tentcraft, Inc.*, No. 1:18-CV-1442, 2019 WL 13297130, at *1 (W.D. Mich. Nov. 25, 2019) (internal citation and quotation marks omitted).  "The importance of the communication required by this rule. . . cannot be overstated." *ECM Converting Co. v. Corrugated Supplies Co., LLC*, No. 1:07-CV-386, 2009 WL 385549, at *2 (W.D. Mich. Feb. 13, 2009) (internal citation and quotation marks omitted).

Here, MMENT's counsel attempted to obtain concurrence on its motion.  On September 2, 2022, MMENT's counsel emailed Hennessey's counsel "to seek concurrence of a partial motion for summary judgment on the disability retaliation (bare notice) claim in the complaint."  (Email Exchange Re: Concurrence, ECF No. 119-2, PageID.2362.)  On September 5, 2022, MMENT's counsel again wrote "I just wanted to see if we could come to some agreement on whether we could stip to the dismissal of any disability retaliation claim (relevant allegation between 64 and 108)."  (*Id.*, PageID.2360.)  Hennessey's counsel responded on September 6, 2022, seeking further

information about the claim and proposed motion.  (*Id.*, PageID.2359.)  MMENT's counsel provided further information that same day.  (*Id.*, PageID.2358.)  Hennessey's counsel then indicated that he would need time to speak to his client about the motion, and MMENT filed the motion for partial summary judgment.  (*Id.*, PageID.2356.)  MMENT attempted to obtain concurrence on its motion via four separate emails; it complied with Local Rule 7.1(d).

In the same vein, both parties' requests for attorney's fees and costs incurred in bringing or responding to this motion will be denied.  Per the American Rule, the bedrock principle is that each party is responsible for its own attorney fees.  *Alyeska Pipeline Serv. Co. v. Wilderness Society*, 421 U.S. 240, 247 (1975); *see also State v. United States*, 986 F.3d 618, 631 (6th Cir. 2021).  However, a district court has "inherent authority" to award attorney fees and costs as a sanction when a party litigates "'in bad faith, vexatiously, wantonly, or for oppressive reasons.'"  *NFP Franchising, LLC v. SY Dawgs, LLC*, 37 F.4th 369, 383 (6th Cir. 2022) (quoting *Big Yank Corp. v. Liberty Mut. Fire Ins. Co.*, 125 F.3d 308, 313 (6th Cir. 1997)).  "In order to award attorneys' fees under this bad faith exception, a district court must find that 'the claims advanced were meritless, that counsel knew or should have known this, and that the motive for filing the suit was for an improper purpose such as harassment.'"  *Big Yank Corp.*, 125 F.3d at 313 (quoting *Smith v. Detroit Fed'n of Tchrs., Loc. 231*, 829 F.2d 1370, 1375 (6th Cir. 1987)).

MMENT did not litigate in bad faith by filing a motion for partial summary judgment after repeatedly attempting to obtain concurrence.  Similarly, the lack of concurrence from Hennessey's counsel does not suggest bad faith either.  Hennessey's counsel had concerns that the motion could negatively impact claims that *are* at issue in the case.  Surely both parties could have done more to resolve this issue before filing a motion for the Court to rule on, but neither party acted in bad faith.  The Court will not award attorneys fees or costs to either party.

### B. False Claims Act Retaliation

MMENT also moves for summary judgment on Hennessey's claim under the anti-retaliation provision of the FCA, 31 U.S.C. § 3730(h).  Hennessey claims that MMENT terminated him in retaliation for investigating potential Medicare fraud related to MMENT's billing of balloon sinuplasties.

> The anti-retaliation provision of the FCA states that
>
> [a]ny employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

31 U.S.C. § 3730(h)(1).  The Sixth Circuit has explained that "[t]he FCA is designed to discourage fraud against the government, and the purpose of the Act's anti-retaliation provision is to encourage the reporting of fraud and facilitate the federal government's ability to stymie crime by protect[ing] persons who assist [in its] discovery and prosecution[.]"  *United States ex rel. Felten v. William Beaumont Hosp.*, 993 F.3d 428, 435 (6th Cir. 2021) (internal citations and quotation marks omitted) (first and second alterations in original).

"Retaliatory discharge claims under the FCA proceed under the same rules applicable to other employment-related retaliation claims."  *Jones-McNamara v. Holzer Health Sys.*, 630 F. App'x 394, 397-98 (6th Cir. 2015) (citing *Scott v. Metro. Health Corp.*, 234 F. App'x 341, 346 (6th Cir. 2007)).  "The plaintiff may establish a case of retaliation by presenting either direct or circumstantial evidence of a retaliatory motive."  *Id.* (citing *Spengler v. Worthington*, 615 F.3d 481, 491 (6th Cir. 2010); *Anthony v. BTR Auto. Sealing Sys., Inc.*, 339 F.3d 506, 514 (6th Cir. 2003)).

"In the absence of direct evidence of retaliatory motive, as here, '[t]he familiar *McDonnell-Douglas* burden-shifting framework applies to retaliation claims.'" *Miller v. Abbott Lab'ys*, 648 F. App'x 555, 559 (6th Cir. 2016) (quoting *Scott*, 234 F. App'x at 346). "Under the *McDonnell-Douglas* test, the plaintiff bears the initial burden to demonstrate a prima facie case of retaliation." *Jones-McNamara*, 630 F. App'x at 398 (citing *Fuhr v. Hazel Park Sch. Dist.*, 710 F.3d 668, 674 (6th Cir. 2013)). "To establish a prima facie case, the plaintiff must show the following elements: (1) [he] was engaged in protected activity; (2) [his] employer knew that [he] engaged in the protected activity; and (3) [his] employer discharged or otherwise discriminated against the employee as a result of the protected activity." *Id.* (citing *Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 566 (6th Cir. 2003)). "Once the plaintiff establishes this prima facie case, the defendant bears the burden of producing a legitimate, nondiscriminatory reason for the adverse employment action." *Id.* (citing *Fuhr*, 710 F.3d at 674). "At that point, the burden again shifts to the plaintiff to demonstrate that the defendant's proffered reason represents a mere pretext for unlawful discrimination." *Id.*

MMENT appears to challenge all three elements of Hennessey's prima facie case. It further argues that it met its burden of producing a legitimate, nondiscriminatory reason for Hennessey's termination that is not pretextual. The Court will address each of MMENT's arguments in turn.

### 1. Protected Activity

#### (a) Reasonable Belief

"To constitute protected activity, 'an employee need not complete an investigation into potential fraud or uncover an actual FCA violation' because the FCA's anti-retaliation provision protects employees while they are merely collecting information about potential fraud." *Miller*, 648 F. App'x at 560 (quoting *Jones-McNamara*, 630 F. App'x at 399). "However, an employee's

activities 'must reasonably embody efforts to stop FCA violations.'" *Id.* (quoting *Jones-McNamara*, 630 F. App'x at 399). Accordingly, the Sixth Circuit, consistent with other circuits, has explained that "'although [the plaintiff] need not establish that [the employer] actually violated the FCA, [he] must show that [his] allegations of fraud grew out of a reasonable belief in such fraud.'" *Id.* (quoting *Jones-McNamara*, 630 F. App'x at 400) (first and second alterations in original); *see also Fakorede v. Mid-South Heart Ctr., P.C.*, 709 F. App'x 787, 789 (6th Cir. 2017). Thus, an employee's activity is protected from retaliation only if: "'(1) the employee in good faith believes, and (2) a reasonable employee in the same or similar circumstances might believe, that the employer is committing fraud against the government.'" *Jones-McNamara*, 630 F. App'x at 399-400 (quoting *Fanslow v. Chi. Mfg. Ctr., Inc.*, 384 F.3d 469, 480 (7th Cir. 2004)). MMENT argues that Hennessey lacked both a subjective and objective belief that Medicare fraud was occurring at MMENT.

There is evidence that Hennessey in good faith believed that MMENT physicians were committing Medicare fraud. Hennessey testified that

> [a]s a physician for MMENT, I understood that if I, or any other MMENT physician submitted a reimbursement form to [the U.S. Department of Health and Human Services' Centers for Medicare and Medicaid Services] for a medically unnecessary procedure, that would constitute Medicare fraud.

(Hennessey Decl. ¶ 6.) In November 2017, Hennessey looked at the patient charts of other MMENT physicians to determine if they were performing medically unnecessary balloon-sinuplasty procedures. Hennessey testified that he "saw no objective evidence of sinusitis on the scans" in cases where balloon-sinuplasty's were performed. (Hennessey Dep. 97.) He expressed these concerns to Lebeda, the President of MMENT. His concerns resurfaced in 2020, and he again looked at the patient charts of other MMENT physicians in January 2021.

MMENT argues that Hennessey's review of patient charts was motivated by his concern for the well-being of patients and the practice's reputation, not fraud. (Def.'s Br. in Supp. of Mot. for Summ. J. on FCA Claim, ECF No. 123, PageID.2444.) But the evidence, when viewed in the light most favorable to Hennessey, suggests that he was concerned about Medicare fraud. In 2017, Hennessey emailed Lebeda explaining that his reservations about the in-office balloon sinuplasty procedure "stem from the initial marketing by the manufacture[r]s that focused on reimbursement over patient outcomes[,]" and that he is "concerned about [MMENT's] legal liability if documentation is not tight and accurate for these procedure[s]." (11/16/2017 Email Exchange Between Hennessey & Lebeda, PageID.2464-2465.) Hennessey also testified that the group discussed his concerns about fraud at a November 15, 2017, shareholder meeting, and "Dr. Lebeda even accused [him] of being a bad partner for investigating fraud." (Hennessey Decl. ¶ 24.) At a shareholder meeting on August 18, 2020, Hennessey again began to discuss MMENT's exposure to penalties from Medicare and private payers if MMENT sought payment for in-office balloon sinuplasties that lacked the proper documentation, but he testified that Lebeda cut him off. (Hennessey Dep. 198-99; Hennessey Decl. ¶¶ 32-33.) In short, Hennessey's conduct in 2017, and 2020, suggests that he held a good-faith belief in 2021 that MMENT physicians were committing Medicare fraud by performing unnecessary balloon sinuplasty procedures.

There is also a genuine dispute of material fact as to whether a reasonable physician in the same or similar circumstances would have believed the same. "An objectively reasonable belief requires facts that exist independently of the plaintiff's personal, interior mentality." *Jones-McNamara*, 630 F. App'x at 404. "[O]nly the evidence in [the plaintiff's] knowledge at the time of [his] investigation and internal reports are relevant[.]" *Id.* at 401 n.4.[8]

---

[8] In its supplemental briefing, MMENT argues that the Supreme Court's recent decision in *United States ex rel. Schutte v. SuperValu Inc.*, 143 S. Ct. 1391 (2023) supports its position that Hennessey did not have an objectively reasonable

As it relates to his 2017 review of patient charts, Hennessey testified that "when [he] showed [the patient scans] to Dr. Goebel and Dr. Lebeda, they agreed with [him]" that there was no indication of sinusitis.  (Hennesssey Dep. 98-99.)  Lebeda does not recall whether he looked at the charts or not.  (Lebeda Dep. 136.)

In 2020, Hennessey's concerns over the procedure resurfaced.  In July 2020, MMENT's office manager told him that Sufyan was performing the procedure without a properly documented justification.  (Hennessey Dep. 154.)  Trgina testified that this conversation concerned the documentation procedures of *all* MMENT physicians, not just Sufyan.  (Trgina Dep. 83-84.)  Also in 2020, MMENT entered into a contract with Acclarent, Inc. where MMENT acquired a TruDi system to perform balloon sinuplasties and agreed to purchase at least six balloons per month from Acclarent.  (Acclarent Contract, PageID.2805.)

Between 2017 and 2021, Hennessey testified that he observed Sufyan's "ever-increasing, frequent use of balloon sinuplasties, as compared to the other MMENT physicians[.]" (Hennessey Decl. ¶ 37.)  Indeed, in response to Hennessey's first set of interrogatories, MMENT provided a chart that demonstrates a rise in the number of balloon sinuplasties performed by Sufyan between 2017 and 2021.  (Def.'s Suppl. Resp. to Pl.'s First Interrogs., ECF No. 131-13, PageID.2812.)

Finally, the parties' respective experts, who reviewed the same patient charts as Hennessey did in 2017 and 2021, disagree as to whether there was a medical necessity to perform a balloon sinuplasty on at least some of these patients.  (*See* Shermetaro Expert Rep., PageID.2962-2963; Casiano Expert Rep., PageID.2737-2738.)

---

belief that MMENT physicians were committing Medicare fraud.  As an initial matter, *SuperValu* pertains to an entirely different provision of the FCA, 31 U.S.C. § 3729, which imposes liability upon a defendant who "knowingly" submits a false claim to the government.  With respect to actions brought under Section 3729, the Supreme Court held that the term "knowingly" means the defendant's actual, subjective belief "that their claims were not accurate[.]" *SuperValu*, 143 S. Ct. at 1404.  *SuperValu* did not change the standard for protected activity under Section 3730 of the FCA, and the Court declines to interpret it as doing so.

In sum, there is a genuine dispute of material fact as to whether a reasonable physician in the same or similar circumstances would have believed that MMENT physicians were committing Medicare fraud by performing unnecessary balloon sinuplasties that they billed to Medicare. "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Liberty Lobby*, 477 U.S. at 255.

### (b) Lawful Acts

The FCA protects employees from retaliation for "*lawful* acts done by the employee . . . to stop 1 or more violations of this subchapter." 31 U.S.C. § 3730(h)(1) (emphasis added). MMENT argues that Hennessey did not engage in protected activity because his accessing of the patient charts of other MMENT physicians violated the Health Insurance Portability and Accountability Act (HIPAA) and was, thus, unlawful.

As an initial matter, neither party cites binding or persuasive authority concerning the interpretation of the term "lawful acts" as used in the anti-retaliation provision of the FCA. The briefing also fails to adequately address whether Hennessey violated HIPAA in 2017 and 2021 by looking at the patient charts of other MMENT physicians.

According to the Department of Health and Human Services, the HIPAA Privacy Rule imposes "appropriate safeguards to protect the privacy of protected health information and sets limits and conditions on the uses and disclosures that may be made of such information without an individual's authorization." U.S. Dep't of Health & Hum. Servs., *The HIPAA Privacy Rule*, https://www.hhs.gov/hipaa/for-professionals/privacy/index.html. It "strikes a balance that permits important uses of information, while protecting the privacy of people who seek care and healing." U.S. Dep't of Health & Hum. Servs., *Summary of the HIPAA Privacy Rule*, https://www.hhs.gov/hipaa/for-professionals/privacy/laws-regulations/index.html.

17

The parties have raised but not adequately briefed whether Hennessey violated the Privacy Rule or whether certain provisions of the Privacy Rule apply to the facts of this case.  One such provision pertains to whistleblowers, 45 C.F.R. § 164.502(j)(1).  It appears that Hennessey's disclosure of protected health information to an attorney in 2021 might be protected under the whistleblower provision, but that might not be the case if Hennessey did not have a right to access the protected health information in the first place.  By its own terms, the whistleblower provision only protects disclosures to an attorney; it does not protect what MMENT argues is the improper disclosure—Hennessey's disclosure of protected health information to himself.

In passing, the parties also cite to the treatment, payment, or health care operations provision, 45 C.F.R. § 164.502(a)(1)(ii), which must comply with 45 C.F.R. § 164.506.  Section 164.506 discusses when covered entities may disclose protected health information to other covered entities.  Neither party offers any analysis of the text of these provisions to show how they do or do not apply here.  For example, Section 164.506 permits a covered entity to disclose protected health information to another covered entity, but only if each covered entity "has or had a relationship with the individual who is the subject of the protected health information being requested[.]"  45 C.F.R. § 164.506(c)(4).  Here, it does not appear that Hennessey had a relationship with the patients whose protected health information he viewed.  However, the definition of "relationship" and whether this provision more broadly protects Hennessey's accessing of the protected health information prior to its disclosure is unclear.

Accordingly, the Court declines to rule on these issues based on the current briefing. MMENT and Hennessey should address these issues in their motion for reconsideration and response brief, respectively.

## 2. Knowledge of the Protected Activity

MMENT also disputes the next element of Hennessey's prima facie case: knowledge.  As part of a prima facie case, "'a plaintiff still must show that his employer was aware of his protected activity.  Merely grumbling to the employer about job dissatisfaction or regulatory violations does not satisfy the requirement—just as it does not constitute protected activity in the first place.'" *McKenzie*, 219 F.3d at 518 (quoting *U.S. ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 743 (D.C. Cir. 1998)).

Here, there is sufficient evidence that MMENT knew of Hennessey's concerns regarding potential Medicare fraud related to balloon sinuplasties.  After Hennessey reviewed patient charts in 2017, he directly expressed his concern to other MMENT physicians.  (*See* 11/16/2017 Email Exchange Between Hennessey & Lebeda; Hennessey Decl. ¶ 24.)  When MMENT physicians learned that Hennessey again reviewed patient charts in 2021, they suspected that he was investigating fraud.  Lebeda testified that Hennessey

> had used [Medicare fraud] as a threat in the past in other litigation, and that he had raised concerns regarding balloon sinuplasty, because his concerns in 2017 had no merit, we thought that -- it crossed our minds that he could use a multitude of things to try and -- to try and negotiate this situation to his advantage even though there was no fraud occurring.

(Lebeda Dep. 145-46.)  Goebel testified that

> Dr. Lebeda had a suspicion based on Dr. Hennessey's prior behavior [in 2017] that he may be trying to gather some kind of information so that he could weave it into a story and use it to file a lawsuit against us . . . . [H]e was following his past blueprint of how to litigate against an adversary.

(Goebel Dep. 25-26.)  In sum, MMENT was aware in both 2017 and 2021 that Hennessey was investigating Medicare fraud related to balloon sinuplasties and contemplating legal action.

### 3. Causation

The final element of Hennessey's prima facie case requires him to establish a causal connection between his protected activity and subsequent termination.  MMENT contends that the Court should apply a "but for" causation standard.  In support of this proposition, MMENT cites the Third Circuit's decision in *DiFiore v. CSL Behring, LLC*, 879 F.3d 71, 78 (3d Cir. 2018).  In a 2018 concurrence, Judge Bush cited *DiFiore* for the proposition that FCA retaliation claims require proof of "but for" causation.  *See Smith v. LHC Grp., Inc.*, 727 F. App'x 100, 110 (6th Cir. 2018) (Bush J., concurring).  However, the Sixth Circuit has yet to explicitly apply a "but for" causation standard to the FCA anti-retaliation provision in a majority opinion.  Accordingly, the Court will apply the causation standard as it currently exists in published Sixth Circuit precedent.

To establish causation, a plaintiff must demonstrate that "his employer discharged or otherwise discriminated against the employee as a result of the protected activity."  *Yuhasz*, 341 F.3d at 566 (citing *McKenzie*, 219 F.3d at 513-14); *see also Fakorede*, 709 F. App'x at 789 (citing *Yuhasz*).  In other words, "the employee must show that 'the retaliation was motivated at least in part by the employee engaging in protected activity.'"  *McKenzie*, 219 F.3d at 518 (citing S. Rep. No. 99-345, at 35).

As the Sixth Circuit has explained, "[t]he causation element [in retaliation cases] often turns on the temporal proximity between the protected activity and the adverse employment action. Indeed, 'the causal connection between the protected activity and the adverse employment action necessary for a prima facie case of retaliation can be established solely on the basis of close temporal proximity.'"  *Render v. FCA US, LLC*, 53 F.4th 905, 921 (6th Cir. 2022) (quoting and citing *Judge v. Landscape Forms, Inc.*, 592 F. App'x 403, 409 (6th Cir. 2014)); *see also Kovacevic v. Am. Int'l Foods*, No. 22-1675, 2023 WL 3756063, at *5 (6th Cir. June 1, 2023) ("True, temporal proximity alone may provide 'evidence of a causal connection for the purposes of satisfying a

*prima facie* case of retaliation.'" (quoting *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 526 (6th Cir. 2008)).  Unlike causation, however, "in retaliation cases 'temporal proximity cannot be the sole basis for finding pretext[.]'"  *Briggs v. Univ. of Cincinnati*, 11 F.4th 498, 516 (6th Cir. 2021) (quoting *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 285 (6th Cir. 2012); *see also Kovacevic*, 2023 WL 3756063, at *5 (citing *Seeger*).

Here, the temporal proximity between Hennessey's allegedly protected conduct and his termination establishes a dispute of fact as to causation.  Hennessey viewed the patient charts of other MMENT physicians on January 19, 2021; days later, MMENT fired him.  True, Hennessey also viewed the patient charts of the other MMENT physicians in 2017, years before his termination.  But that does not defeat an inference that MMENT terminated Hennessey in 2021, at least in part, due to his actions days prior.

### 4. Pretext

MMENT contends that it had a legitimate non-retaliatory reason for Hennessey's termination.  According to Hennessey's termination letter, MMENT terminated him for violating HIPAA and suspending his medical malpractice insurance.  (*See* Termination Letter, PageID.2153.)  MMENT further contends that Hennessey's refusal to pay overhead and retain on-call obligations, as well as his history of being unaccommodating and treating other medical practitioners inappropriately, also factored into the decision to terminate him.  (*See* Goebel Dep. 28, 44-45; Lebeda Dep. 100.)

In the presence of legitimate non-retaliatory reasons, the burden shifts back to Hennessey to demonstrate that these alleged reasons were pretext for retaliation.  "'A plaintiff will usually demonstrate pretext by showing that the employer's stated reason for the adverse employment action either (1) has no basis in fact, (2) was not the actual reason, or (3) is insufficient to explain the employer's action.'"  *Thompson v. Quorum Health Res., LLC*, 485 F. App'x 783, 790-91 (6th

Cir. 2012) (quoting *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 393 (6th Cir. 2008)). "'However, the plaintiff may also demonstrate pretext by offering evidence which challenges the reasonableness of the employer's decision to the extent that such an inquiry sheds light on whether the employer's proffered reason for the employment action was its actual motivation.'" *Id.* (quoting *White*, 533 F.3d at 393).

<u>HIPAA Violation</u>

Hennessey offers evidence that suggests MMENT did not terminate Hennessey for violating HIPAA. First, MMENT failed to provide breach notifications to the relevant patients within 60 days as required by 45 C.F.R. § 164.404. Several MMENT physicians testified that, as of the date of their depositions, MMENT had not reported Hennessey's alleged HIPAA violation to any of the relevant patients. (*See* Sufyan Dep. 152-53; Gainor Dep., 68-69.)

Hennessey also points out that MMENT failed to follow its own HIPAA Privacy Compliance Plan ("Compliance Plan") after the alleged breach occurred. The Compliance Plan requires Trgina, as the privacy officer, to investigate and document all potential HIPAA violations. (Compliance Plan, ECF No. 131-24.) This investigation includes "[m]eet[ing] with the staff member(s) who may have violated the policies and procedures" and "[d]ocument[ing] the findings of the investigation and action taken[.]" (*Id.*, PageID.2886.) Trgina testified that she did not investigate or document the alleged HIPAA violation; rather, she referred the issue to Lebeda. (Trgina Dep. 121.) The Compliance Plan allows a privacy officer to delegate responsibilities to other staff members, but the privacy officer herself remains responsible for making sure the responsibilities are carried out. (Compliance Plan, PageID.2884.) Trgina testified that she does not know if Lebeda or anyone at MMENT investigated and documented Hennessey's alleged breach. (Trgina Dep. 53, 130.) Indeed, Lebeda testified that MMENT "never reached a conclusion

either one way or the other" as to whether a HIPAA violation occurred. (Lebeda Dep. 101.) MMENT's failure to follow both HIPAA regulations and internal protocol after Hennessey's asserted breach casts doubt on whether MMENT terminated Hennessey for the breach.

<u>Medical Malpractice Insurance</u>

Hennessey also presents evidence that challenges the reasonableness of terminating him for suspending his medical malpractice insurance. MMENT contends that Hennessey "unilaterally" suspended his malpractice insurance. (*See* Def.'s Br. in Supp. of Mot. for Summ. J. on FCA Claim, PageID.2420.) On December 18, 2020, Hennessey emailed Trgina "to see what the options [were] for [his] malpractice insurance given that [he] [had] not been working[.]" (12/18/2020 Hennessey & Trgina Email Exchange, PageID.2918.) Trgina reached out to the Doctor's Company, who presumably handles MMENT's malpractice insurance, and forwarded its response to Hennessey. (*Id.*, PageID.2917.) Accordingly, Hennessey did not "unilaterally" suspend his malpractice insurance as MMENT suggests; instead, he informed and sought assistance from MMENT's office manager. Lebeda also testified that if a physician told Trgina that they intended to suspend their malpractice insurance, he would expect her to report that to him. (Lebeda Dep. 22.) The evidence suggests that Hennessey did not suspend his malpractice insurance without warning.

MMENT also calls Hennessey's suspension of malpractice insurance improper because the MMENT physicians "were under the impression that, although unable to see patients in person or practice surgery, [Hennessey] would be available for consultations, telehealth and other professional services, on an as needed basis." (Termination Letter, PageID.2153.) True, if Hennessey suspended his policy, then he could not see or talk to any patients. (12/18/2020

23

Hennessey & Trgina Email Exchange, PageID.2917.)  Only insurance claims filed while his policy was active would remain covered during the suspension.  (*Id.*)

However, there is a dispute as to what obligations Hennessey would maintain during his recovery and whether suspending his malpractice insurance was reasonable in light of his continuing obligations to MMENT.  On November 24, 2020, Hennessey emailed the MMENT physicians offering to continue checking messages in Allscripts to answer questions from his patients and to provide telehealth visits.  (11/24/2020 Hennessey Email.)  However, he also testified that he held two days of telehealth clinics shortly after his injury but discontinued this service because patients had "very little interest[.]"  (Hennessey Dep. 20.)

## MMENT's Additional Justifications

"[W]hile 'an employer's shifting termination rationales are evidence that the proffered rational may not have been the true motivation for the employer's actions,' providing '*additional*, non-discriminatory reasons that do not conflict with the one stated at the time of discharge does not constitute shifting justifications[.]'"  *Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 327-28 (6th Cir. 2021) (quoting *Miles v. S. Ctr. Hum. Res. Agency, Inc.*, 946 F.3d 883, 890-91 (6th Cir. 2020)).  Here, MMENT provides additional non-discriminatory reasons for Hennessey's termination that do not conflict with those listed in his termination letter.  However, when viewing the evidence in the light most favorable to him, Hennessey demonstrates a genuine dispute of material fact as to whether these additional justifications are pretext for retaliation.

Hennessey presents evidence that challenges the reasonableness of MMENT terminating him for refusing to pay overhead and maintain on-call obligations during his recovery.  MMENT sought the advice of an employment law attorney prior to terminating Hennessey.  MMENT's attorney, testified that on January 16, 2021, he advised MMENT that Hennessey's failure to take

call constitutes a breach of the Employment Agreement, but that MMENT must give Hennessey 30 days-notice prior to terminating him for this breach.  (Roragen Dep. 22-23, 33-34, ECF No. 131-21.)  MMENT terminated Hennessey on January 22, 2021.  (Termination Letter.)  He further testified that, as of January 16, 2021, he advised MMENT that the only basis for termination would be if the parties agreed that Hennessey would not return to work within 180 days.  (Roragen Dep. 25-26.)

With respect to Hennessey's conduct issues, the instances MMENT cites occurred years prior to his termination, the most recent being in May 2020.  On June 17, 2020, the MMENT physicians met to discuss McLaren's concerns about Hennessey and his dealings with its emergency department.  (Sufyan Dep. 254.)  Sufyan testified that since that meeting in 2020, he is unaware of any other complaints from McLaren about Hennessey.  (*Id.*)

In summary, viewing the evidence in a light most favorable to Hennessey, a jury could infer that MMENT's proffered reasons were a pretext and that Hennessey's investigation into Medicare fraud improperly motivated its decision.

### IV. CONCLUSION

For the reasons stated above, the Court will deny MMENT's motion for partial summary judgment (ECF No. 114) on a "notice-pled" disability retaliation claim as moot.  It will further deny MMENT's motion for partial summary judgment (ECF No. 123) on the FCA retaliation claim without prejudice.  MMENT may file a motion for reconsideration and accompanying brief within seven days addressing whether Hennessey's actions were "lawful" and, thus, protected conduct under the anti-retaliation provision of the FCA.  Hennessey may file a response within seven days

thereafter addressing the same.

An order will enter in accordance with this Opinion.


Dated: July 21, 2023                    /s/ Hala Y. Jarbou
                                        HALA Y. JARBOU
                                        CHIEF UNITED STATES DISTRICT JUDGE